NA

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Gerald Allen Johnson,

               Plaintiff,

v.

David Shinn, et al.,

               Defendants.

No.   CV 20-02347-PHX-DGC (DMF)

**ORDER**

On December 3, 2020, Plaintiff Gerald Allen Johnson, who is confined in the Arizona State Prison Complex-Eyman, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983 (Doc. 1), Application to Proceed In Forma Pauperis, and a Motion to Accept Application to Proceed.  In a December 15, 2020 Order, the Court denied the deficient Application to Proceed with leave to refile and denied the Motion to Accept.  On January 4, 2021, Plaintiff filed a Motion for Court Order (Doc. 9) and an Application to Proceed In Forma Pauperis (Doc. 12).  On January 29, 2021, Plaintiff filed a Motion to Withdraw (Doc. 14).  The Court will grant the Application to Proceed, dismiss the Complaint with leave to amend, grant the Motion to Withdraw, and deny as moot the Motion for Court Order.

## I.      Application to Proceed In Forma Pauperis and Filing Fee

The Court will grant Plaintiff's Application to Proceed In Forma Pauperis.  28 U.S.C. § 1915(a).  Plaintiff must pay the statutory filing fee of $350.00.  28 U.S.C. § 1915(b)(1).  The Court will assess an initial partial filing fee of $11.83.  The remainder

JDDL-K

of the fee will be collected monthly in payments of 20% of the previous month's income credited to Plaintiff's trust account each time the amount in the account exceeds $10.00. 28 U.S.C. § 1915(b)(2). The Court will enter a separate Order requiring the appropriate government agency to collect and forward the fees according to the statutory formula.

## II.   Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342

(9th Cir. 2010).  A "complaint [filed by a pro se prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

If the Court determines that a pleading could be cured by the allegation of other facts, a pro se litigant is entitled to an opportunity to amend a complaint before dismissal of the action.  *See Lopez v. Smith*, 203 F.3d 1122, 1127-29 (9th Cir. 2000) (en banc). Plaintiff's Complaint will be dismissed for failure to state a claim, but because it may possibly be amended to state a claim, the Court will dismiss it with leave to amend.

**III.    Complaint**

In his three-count Complaint, Plaintiff names as Defendants Arizona Department of Corrections (ADC) Director David Shinn, Unknown Centurion of Arizona Chief Executive Officer ("Centurion's CEO"), and ASPC-Eyman Corrections Officer III Jackson.  Plaintiff seeks monetary damages, injunctive relief, and costs of suit.

In **Count One**, Plaintiff asserts a violation of his Eighth Amendment rights regarding a "degradation of pulmonary health."  Plaintiff began his 40-year sentence in ADC custody in October 1992.  Plaintiff, a non-smoker, was housed in a poorly ventilated cell with seven other men.  The State, while fully aware of the health consequences and addictive nature of tobacco, provided inmates with "large quantities of 'free' tobacco" and allowed inmates to smoke in their cells.  Plaintiff further claims the State had the "sole objective of addicting as many inmates as possible" for financial gain.  At some point, Plaintiff began using tobacco and became addicted to smoking.  Plaintiff tried to quit several times, but ADC does not offer assistance or encouragement.

Approximately ten years ago, Plaintiff quit smoking tobacco and began chewing tobacco because he had a severe cough and was coughing up dark phlegm.  Over four years ago, Plaintiff quit using all tobacco products, but "the damage was already done."  He began suffering shortness of breath approximately three years ago.  Plaintiff was recently diagnosed with emphysema, and his health is deteriorating.

On June 10, 2020, Plaintiff was transferred to a living area that was mostly non-smoking, and he did not need to use his emergency inhaler as often as in the past. Plaintiff's headaches and cough became manageable, and he was able to sleep through the night without waking up choking.

On August 11, 2020, Plaintiff was transferred to a new living area with "heavy smokers." Within a week, Plaintiff's cough and headaches worsened; his throat, sinuses, and eyes became irritated; he had to use his emergency inhaler more often; and he began waking up at night choking. Since his arrival to the living area, he has suffered several "severe asthma attacks." During a recent COVID-19 lockdown, Plaintiff "literally could not breath[e]" due to the amount of smoke. Plaintiff claims that ADC was aware that second-hand smoke was harmful to his health when they moved him to this living area, as Plaintiff filed a medical grievance on May 28, 2020 informing ADC.

Plaintiff claims his health issues are not solely the result of his past tobacco use and addiction. Plaintiff alleges that ADC staff "knowingly and intentionally allow [his] health to deteriorate . . . by subjecting [him] to overwhelming concentrations of second-hand cigarette smoke." Staff allow inmates to smoke in poorly ventilated living areas. Plaintiff's current living area has "stifling clouds of smoke hover[ing] in the air throughout the night[] caused by multiple chain[-]smoking inmates lighting up every ten to fifteen minutes." Plaintiff often wakes up unable to breathe. Plaintiff claims ADC officers walk through his living area and do not say or do anything about the smoking. Plaintiff claims it would be "next to impossible" to stop inmates from smoking because there are not enough officers, and the inmates do not follow the rules.

Plaintiff states that he was "not sentenced to endure constant torture nor to have [his] physical health wrecked by an incurable pulmonary disease." Plaintiff alleges that Shinn has failed to create non-smoking living areas and has "intentionally lock[ed him] in gas chambers filled with tobacco smoke." Plaintiff claims that inmates are allowed to smoke because the State of Arizona receives "taxes and commissary kickbacks" from tobacco sales to inmates.

In **Count Two**, Plaintiff asserts a medical care claim and alleges that Defendants Shinn and Centurion's CEO failed to provide him adequate medical treatment for his emphysema/chronic obstructive pulmonary disease (COPD).  Approximately three years ago, Plaintiff began experiencing shortness of breath when exerting himself.  Sometime later, Plaintiff started suffering shortness of breath from walking or being exposed to second-hand smoke.  Approximately two years ago, Plaintiff "began raising the problem" with his medical provider during his chronic care visits.  Plaintiff claims his concerns were never addressed or treated, and his breathing problems worsened.

Plaintiff filed his first Health Needs Request (HNR) on July 8, 2019 regarding his breathing problems.  Plaintiff filed two more HNRs on July 23 and August 26, 2019.  The three HNRs were returned to Plaintiff, stating he was scheduled for the Nurses' Line.  On August 31, 2019, Plaintiff had a telemedicine appointment with a Centurion provider.  Plaintiff was diagnosed with COPD and prescribed a bronchiole relaxer, breathing treatments, and two inhalers.  Plaintiff claims that Centurion Nursing Staff regularly denied him breathing treatments because "they were too busy."

Despite using the medication, Plaintiff's breathing difficulties worsened, and in October 2019, Plaintiff developed a severe cough.  Plaintiff discussed the problems with a Centurion provider during a chronic care visit, and the provider ordered chest x-rays and antibiotics.  The antibiotics were ineffective, and Plaintiff's cough persisted for months.  Plaintiff asked Centurion staff for "help," but he did not receive any other treatment for his cough.

On November 14, 2019, a Centurion provider, Ms. Thomas, summoned Plaintiff to the medical unit and told Plaintiff that the chest x-rays showed an "irregular mass" on his lungs.  Ms. Thomas ordered a CT scan and labs to test for tuberculosis and valley fever, but she did not order any cancer screening.  On December 21, 2019, Plaintiff had the CT scan.  On January 7 and 8, 2020, Plaintiff received "medical notices" from Centurion, stating that the results from the tests and scan were "acceptable."  On January 8, 2020,

Plaintiff submitted an HNR asking how the mass on his lungs was determined to be "acceptable" when he was coughing up phlegm and having a difficulty breathing.

On January 16, 2020, Plaintiff submitted two informal complaints, one concerning the medical notices and one concerning his continued difficulty obtaining medication and breathing treatments. Plaintiff's January 8, 2020 HNR was returned to him, stating that he was scheduled to see a provider. For more than a month, Plaintiff was worried because he was coughing up phlegm, he still had difficulty breathing, and Centurion "refus[ed]" to tell him if the mass on his lungs was cancerous. On February 13, 2020, Plaintiff had a telemedicine appointment with a nurse, not with a provider. The nurse referred Plaintiff to a provider and was unable to discuss the CT results with him or help him with his coughing or breathing problems.

On February 17, 2020, Plaintiff submitted another informal complaint by hand-delivering it to Defendant Jackson. Jackson emailed the Director of Nursing a copy of the Plaintiff's informal complaint. On February 18, 2020, Plaintiff was added to the Provider Line "via 'write in.'" The provider, Ms. Thomas, told Plaintiff that the CT showed a "'nodule' of unknown origin" on his lung. Ms. Thomas told Plaintiff that she planned to order CT scans every three months for a year to monitor the nodule. Ms. Thomas also diagnosed Plaintiff with emphysema and prescribed him a third inhaler. Ms. Thomas did not order any other tests, and she "neglected to treat [his] persistent cough." Plaintiff left the appointment "more frustrated, confus[]ed and worried." Later that evening, Plaintiff's two January 16 informal complaints were returned to him "unprocessed."

On April 29, 2020, Plaintiff was summoned for a telemedicine chronic care appointment. The provider "made it clear" that he was not going to discuss Plaintiff's yet-to-be-scheduled second CT scan, Plaintiff's continued breathing problems and cough, or any potential side effects from the inhalers. Later that day, Plaintiff hand-delivered another informal complaint to Defendant Jackson so he could email it to the Director of Nursing.

On May 5, 2020, Plaintiff was again added to the Provider Line. Plaintiff's appointment with the provider only lasted a few minutes. The provider told Plaintiff to

stop taking his medications if he was experiencing headaches, a cough, and urinary problems.  Plaintiff then provided a urine sample before the appointment was terminated.  On May 7, 2020, Plaintiff had his second, and last, CT scan.

Plaintiff claims that Centurion employees "deliberately neglect to address [his] medical needs" unless he submits an informal complaint.  Even when he did submit informal complaints, the visits are inadequate, and the plans are often not followed until he submits another informal complaint, if at all.

On May 27, 2020, Plaintiff submitted a formal grievance to Correctional Officer (CO) III Viegas, who handed the document to Defendant Jackson for processing.  On May 28, 2020, Plaintiff received the Director of Nursing's response to his April 29, 2020 informal complaint, stating that his April 29 telemedicine appointment was to address his chronic care issues.  Plaintiff thought asthma/COPD is a chronic care issue, but Centurion refuses to recognize Plaintiff's COPD as a chronic care issue.

On June 10, 2020, Plaintiff saw a nurse practitioner, Ms. Merriman.  Ms. Merriman told Plaintiff that the results of his labs "showed no signs of cancer."  Plaintiff told Ms. Merriman that the lab technician told Plaintiff that they were not screening for cancer.  Ms. Merriman disputed this claim and "quickly changed the subject."  Ms. Merriman further told Plaintiff that further CT scans were not necessary.  She prescribed Plaintiff Tylenol to treat his headaches, increased the dosage of Terazosin to treat his urinary issues, and told Plaintiff to purchase cough drops from the Inmate Commissary.  Plaintiff told Ms. Merriman that he was worried that Centurion did not plan on doing anything about or find the root cause of the nodule on his lung.  Ms. Merriman told Plaintiff he could request a biopsy but that it was unlikely Centurion would approve his request.  Plaintiff immediately requested a biopsy.

On June 30, 2020, a Centurion provider, Ms. Gay-Johnson, informed Plaintiff that his request for a biopsy had been denied.  Plaintiff expressed his fears about the nodule and Centurion's refusal to treat it, and Ms. Gay-Johnson told Plaintiff the only thing she could do was submit a request for Plaintiff to see a pulmonary specialist.  At some point,

"Centurion Providers" determined that Plaintiff's "symptoms" are the result of "a simple 'allergy' to tobacco smoke." Plaintiff has been provided two allergy medications, and they were "proven to do little."

On August 25, 2020, Plaintiff spoke to "someone claiming to be a Pulmonary Specialist" on the phone. The specialist told Plaintiff that she reviewed his CT scans and found the nodule had not increased in size and appeared calcified, which signified that it may have been on his lung "for some time." The specialist determined that a biopsy was unnecessary at the time, but she recommended Plaintiff have a follow-up CT scan in a year. The specialist also stated that the CT showed signs of emphysema and asked what medications Centurion had provided him. The Centurion nurse that was in the room told the specialist the inhalers Plaintiff was prescribed. The specialist "exclaimed" that those inhalers are to treat asthma, not COPD or emphysema, and she recommended an "immediate" change of medication.

On September 2, 2020, Plaintiff was provided two new inhalers of Alvesco, which is the same medication Plaintiff had been receiving prior to his August 25 telemedicine visit with the pulmonary specialist. Ms. Gay-Johnson increased his twice daily dose from 80 mcg to 160 mcg, and the type of inhaler was not changed. The increased dose did not alleviate Plaintiff's symptoms. Instead, Plaintiff's breathing difficulties, cough, and headaches worsened.

On September 18, 2020, Plaintiff mailed a "Notice of Claim Against The State of Arizona" regarding the increased dose of Alvesco and Centurion's failure to change his medication. On October 2, 2020, Plaintiff was called to medical, and Ms. Gay-Johnson informed Plaintiff that his inhaler had been changed from Alvesco to Incruse Ellipta.[1] Ms. Gay-Johnson did not provide Plaintiff with any information about the new medication. Later that day, Plaintiff received his Incruse Ellipta inhaler and instructions to take one inhalation twice daily for 120 days. Each inhaler contains 30 doses, and the manufacturer

[1] Incruse Ellipta is a medication used to treat COPD. U.S. National Library of Medicing, https://medlineplus.gov/druginfo/meds/a614024.html, Search Incruse Ellipta (last visited Feb. 1, 2021).

recommends it be inhaled once daily.  On October 2, 2020, Plaintiff submitted an HNR seeking clarification of the dosage due to the discrepancy between Centurion's instructions and the manufacturer's recommendations.  In the HNR, Plaintiff also asked if he would be prescribed a new inhaler every 15 days.

Plaintiff chose to follow the manufacturer's recommendations of one inhalation per day until he received a response from Centurion; this dose turned out to be a prophylactic dose.  Plaintiff never received a response to the HNR, and he was not seen on the Nurses' Line or Provider Line.  Plaintiff did not receive a new inhaler after fifteen days, and if he had followed Centurion's instructions he would have run out of the medication.

On October 22, 2020, Plaintiff filed an informal complaint, but he did not receive a response.  On October 28, 2020, Plaintiff was summoned for a telemedicine chronic care appointment to discuss his hypertension.  At the appointment, Plaintiff asked about his inhaler, and the Centurion provider said he would "look into it."  On October 31, 2020, Plaintiff received a new Incruse Ellipta with instructions to take one inhalation daily. Plaintiff claims this shows that Centurion "deliberately neglect[s]" his medical needs until he files a complaint.

In **Count Three**, Plaintiff asserts a retaliation claim and alleges that Defendant Jackson, Defendant Shinn's subordinate, intentionally misrepresented the content of Plaintiff's confidential medical grievance to her inmate clerk "in direct retaliation of [his] insist[e]nce she provide reasonable assistance with [his] medical grievance."  As a result, Plaintiff suffered "serious physical and financial harm."  Plaintiff claims he was assaulted by several inmates and lost hundreds of dollars in personal property.  In a July 8, 2019 HNR and in several medical appointments, Plaintiff told medical staff that his breathing difficulties are exacerbated by tobacco smoke.  In a May 27, 2020 grievance, Plaintiff again complained about second-hand tobacco smoke and its effects on his breathing and daily activities.  In that grievance, Plaintiff deliberately chose not to discuss ADC employees allowing inmates to smoke in inmate living areas because he was scared he would be assaulted if other inmates saw the grievance.

On May 28, 2020, Defendant Jackson's inmate clerk handed Plaintiff a response to his April 29, 2020 informal complaint from the Director of Nursing.  Plaintiff asked Jackson to provide written certification of the date and time he was provided the Director of Nursing's response because "the certification was required."   Jackson became "disdainful" and angry and told Plaintiff that was not her job.  Plaintiff was insistent, and Jackson dated the response.

On May 29, 2020, Jackson's inmate clerk and two other inmate "shot-callers" approached Plaintiff.  Jackson's inmate clerk said Jackson had told him that Plaintiff had submitted a grievance complaining about the smoke in his living area.  Plaintiff tried to explain that he had submitted a medical grievance and had not mentioned the inmates smoking "on the run."  The inmates "made it appear they'd accepted what [Plaintiff] said and claimed that all was cool," but Plaintiff was violently attacked a few minutes later by "three youngsters, aka 'Torpedos.'"  Two inmates approached Plaintiff from behind and restrained his arms while the third hit Plaintiff in the head and body.  Plaintiff does not remember anything else until he regained consciousness in Medical.

When he regained consciousness, Plaintiff could not remember how or why he was assaulted.   Staff questioned Plaintiff about the incident, but he could not think or "intelligently respond."  As a result of the incident, Plaintiff suffered a serious head injury and was later transported to an emergency room to be examined and treated.  Plaintiff was in the emergency room for several hours before being transported to Special Management Unit I (SMU I).  As time progressed, Plaintiff began to piece together the events leading up to the assault, and he realized that he had been assaulted "at the direction or intentional instigation of an [ADC] employee."  Plaintiff was not questioned about the incident again, and he "felt it safer not to push the issue at the time."

When he arrived at SMU-I, Plaintiff was placed in cell without a mattress or bedding.  The cell was "covered in filth," smelled like "a sewer," and had urine and feces "splattered everywhere."  When officers walked by his cell, Plaintiff requested cleaning supplies, hygiene items, and bedding, but the officers ignored him.  After 24 hours, Plaintiff

was given a "filthy mat" to lie on and was periodically provided toilet paper.  Plaintiff was housed in that cell for 72 hours and was never provided cleaning supplies or hand soap and had to eat with his hands because he never received utensils.

After three days, Plaintiff was moved to a different cell "with marginally better conditions," but it was "infested with rats and roaches to the point that [he] couldn't sleep without them crawling all over [him]."  Plaintiff was provided a mattress, bedding, hygiene materials, and eating utensils, but he was not given supplies to clean the rat and roach droppings or the toilet and sink.  Plaintiff spent nine days in this cell before being transferred to the Meadows Unit on June 10, 2020.

On June 12, 2020, Plaintiff was summoned to Meadows Unit Property to retrieve his property, but he discovered that approximately eighty percent of his property was missing, worth over $700.  Plaintiff immediately told CO II Comacho, the property officer, that his property was missing, and he later sent a letter to Comacho asking that he locate the missing property.  Plaintiff later filed a grievance and an appeal to Defendant Shinn, but he never received a response.

Plaintiff appears to allege that he submitted grievances regarding Defendant Jackson's "cruel and treacherous retaliation" resulting in "lost religious items," "missing work pay," and a "threat of a $32.00 charge to [him] for missing lending library books."  Plaintiff further claims that his attempts to secure "appropriate medical care" resulted in him being assaulted, "treated like an animal," losing his personal property, and losing his job and income.  Plaintiff states that he is still being subjected to "overwhelming amounts of cigarette smoke."  Plaintiff also claims that although he did not directly grieve Jackson's retaliation out of fear of further retaliation, he did mention Jackson's actions in his grievances and appeals, but Defendant Shinn did not respond to "any of the three."

**IV.     Failure to State a Claim**

        **A.     Conditions of Confinement**

To state an Eighth Amendment conditions-of-confinement claim, plaintiffs must meet a two-part test.  "First, the alleged constitutional deprivation must be, objectively,

sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

"*Helling v. McKinney* sets out the constitutional framework for Eighth Amendment claims about involuntary exposure to environmental hazards." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019) (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). In *Helling*, the Supreme Court held that "the Eighth Amendment protects against future harm" and the "remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33 (holding that the prisoner plaintiff stated a claim under the Eighth Amendment by alleging that he was exposed to levels of ETS that "posed an unreasonable risk of serious damage to his future health"); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (a plaintiff need only demonstrate that "the threatened injury is 'certainly impending,' or there is a "substantial risk that the harm will occur."). The Eighth Amendment does not require a smoke-free environment, only that prisoners not be exposed to unreasonable levels of tobacco smoke. *Helling,* 509 U.S. at 35.

### 1.    Count One

There is no respondeat superior liability under § 1983 and, therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a

plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has not alleged that Defendant Shinn personally participated in a deprivation of Plaintiff's constitutional rights, was aware of a deprivation and failed to act, or formed policies that resulted in Plaintiff's injuries. Plaintiff's allegations do not support that Shinn was personally aware of Plaintiff's medical condition, complaints, housing assignment, or exposure to tobacco smoke. Although Plaintiff claims Shinn failed to create non-smoking living areas, Department Order 109 prohibits smoking in enclosed areas, buildings, housing areas, and within 20 feet of any building entrance.[2]  Plaintiff also does not allege facts to support that Shinn was aware that rules related to smoking were being violated or not enforced. The Court will dismiss Count One against Shinn.

### 2.    Count Three

In Count Three, Plaintiff alleges that he was placed in a filthy cell without a mattress, bedding, cleaning supplies, or hygiene items and never received utensils. Plaintiff also alleges that he was later placed in a different cell that was infested with rats and roaches. Plaintiff claims that officers who walked by his cell ignored his requests for bedding, cleaning supplies, and hygiene items. Assuming that Plaintiff sufficiently alleges his conditions rose to a constitutional level, he fails to link any of his allegations to any named defendant. The Court accordingly will dismiss his conditions-of-confinement claims in Count Three.

### B.    Medical Care – Count Two

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the

---

[2] *See*  https://corrections.az.gov/sites/default/files/policies/100/0109_112919.pdf (last visited Jan. 26, 2021).

1  defendant's response was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th
2  Cir. 2006).

3        "Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d
4  1051, 1060 (9th Cir. 2004).  In the medical context, it may be shown by a purposeful act
5  or failure to respond to a prisoner's pain or possible medical need and harm caused by the
6  indifference.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may also be shown when a
7  prison official intentionally denies, delays, or interferes with medical treatment or by the
8  way prison doctors respond to the prisoner's medical needs.  *Estelle v. Gamble*, 429 U.S.
9  97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

10       Deliberate indifference is a higher standard than negligence or lack of ordinary due
11  care for the prisoner's safety.  *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross
12  negligence will constitute deliberate indifference."  *Clement v. Cal. Dep't of Corr.*, 220 F.
13  Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458,
14  460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"
15  do not support a claim under § 1983).  "A difference of opinion does not amount to
16  deliberate indifference to [a plaintiff's] serious medical needs."  *Sanchez v. Vild*, 891 F.2d
17  240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to
18  state a claim against prison officials for deliberate indifference.  *See Shapley v. Nev. Bd. of
19  State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be
20  substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain."
21  *Estelle*, 429 U.S. at 105.

22                    **1.    Defendant Shinn**

23       As noted above, there is no respondeat superior liability under § 1983.  *Monell*, 436
24  U.S. 658.  Plaintiff fails to allege facts to support that Defendant Shinn was aware of his
25  serious medical needs or treatment, that Plaintiff was prescribed the wrong inhalers and the
26  incorrect dosage for the correct inhaler, denied prescribed breathing treatments, or that
27  Plaintiff was not provided treatment unless and until he filed an informal complaint.
28

Accordingly, the Court will dismiss Plaintiff's claims against Defendant Shinn in Count Two.

### 2.      Defendant Centurion CEO

Plaintiff has failed to allege facts that show Defendant Centurion CEO was aware of Plaintiff's medical needs and requests for treatment and medication, or that Plaintiff was denied prescribed treatment unless or until he filed an informal complaint.  Accordingly, the Court will dismiss Plaintiff's claims against Defendant Centurion CEO.

To the extent Plaintiff intended to name Centurion as a defendant, his claims in Count Two would also fail.  To state a claim under § 1983 against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam).  A plaintiff must allege the specific policy or custom and how it violated his constitutional rights.  A private entity is not liable merely because it employs persons who allegedly violated a plaintiff's constitutional rights.  *See Tsao*, 698 F.3d at 1139; *Buckner*, 116 F.3d at 452.  Plaintiff's allegations regarding a policy, practice, or custom are vague and conclusory and in no way suggest that any of the conduct described in the Complaint was the result of a specific policy or custom of Defendant Centurion.

### C.      Retaliation – Count Three

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in

JDDL-K

1   retaliation for the exercise of a constitutionally protected right, and (2) that the action
2   "advanced no legitimate penological interest").   The plaintiff has the burden of
3   demonstrating that his exercise of his First Amendment rights was a substantial or
4   motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ.*
5   *v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314
6   (9th Cir. 1989).

7       Plaintiff's allegations in Count Three are insufficient to state a retaliation claim
8   against Defendant Jackson.  Plaintiff does not allege facts to show that Jackson told the
9   prisoners who assaulted him that Plaintiff had grieved or complained about second-hand
10  smoke, or even that the assaulting prisoners knew Plaintiff had done so.  Indeed, it appears
11  from the allegations that the inmate clerk, not Jackson, misrepresented the content of
12  Plaintiff's confidential medical grievance and informed the assaulting prisoners.   Even if
13  Jackson had misrepresented the content of his grievance, Plaintiff's allegations are not
14  sufficient to support that Jackson did so in retaliation for Plaintiff seeking her assistance in
15  filing his grievance or engaging in any other constitutionally protected conduct.
16  Accordingly, the Court will dismiss Plaintiff's retaliation claim against Defendant Jackson.

17      **D.     Property – Count Three**

18      The Fourth Amendment does not protect an inmate from the seizure of his property.
19  *Hudson v. Palmer*, 468 U.S. 517, 528 n.8 (1984); *see also Taylor v. Knapp*, 871 F.2d 803,
20  806 (9th Cir. 1989) (no Fourth Amendment claim arose from seizure, conversion, and
21  destruction of inmate's assets).  Such a claim would arise, if at all, under the Due Process
22  Clause of the Fourteenth Amendment.   But the "Due Process Clause is simply not
23  implicated by a *negligent* act of an official causing unintended loss of or injury to life,
24  liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  Even unauthorized
25  and intentional deprivations of property do not constitute a violation of procedural
26  requirements of the Due Process Clause if a meaningful post-deprivation remedy for the
27  loss is available. *Hudson*, 468 U.S. at 533.  The availability of a common-law tort suit
28  against a state employee constitutes an adequate post-deprivation remedy. *Id.* at 534-35.

1    Moreover, Arizona provides a meaningful and adequate post-deprivation remedy through

2    the prison grievance system, specifically Department Order 909(8.0).  *Dennison v. Ryan*,

3    522 F. App'x 414, 417-18 (9th Cir. 2013); *Aldrete v. Ariz. Dep't of Corr.*, 2011 WL 30959,

4    at *7 (D. Ariz. Jan. 3, 2011); *see also Wright v. Riveland*, 219 F.3d 905, 918 (9th Cir. 2000)

5    (both state tort claims *and* prison grievance procedures provide adequate post-deprivation

6    remedies).  Accordingly, the Court will dismiss Plaintiff's property claim in Count Three.

7    **V.      Leave to Amend**

8            For the foregoing reasons, Plaintiff's Complaint will be dismissed for failure to state

9    a claim upon which relief may be granted.  Within 30 days, Plaintiff may submit a first

10   amended complaint to cure the deficiencies outlined above.  The Clerk of Court will mail

11   Plaintiff a court-approved form to use for filing a first amended complaint.  If Plaintiff fails

12   to use the court-approved form, the Court may strike the amended complaint and dismiss

13   this action without further notice to Plaintiff.

14           Plaintiff must clearly designate on the face of the document that it is the "First

15   Amended Complaint."  The first amended complaint must be retyped or rewritten in its

16   entirety on the court-approved form and may not incorporate any part of the original

17   Complaint by reference.  Plaintiff may include only one claim per count.

18           A first amended complaint supersedes the original Complaint.  *Ferdik v. Bonzelet*,

19   963 F.2d 1258, 1262 (9th Cir. 1992); *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d

20   1542, 1546 (9th Cir. 1990).  After amendment, the Court will treat the original Complaint

21   as nonexistent.  *Ferdik*, 963 F.2d at 1262.  Any cause of action that was raised in the

22   original Complaint and that was voluntarily dismissed or was dismissed without prejudice

23   is waived if it is not alleged in a first amended complaint.  *Lacey v. Maricopa County*, 693

24   F.3d 896, 928 (9th Cir. 2012) (en banc).

25           To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants

26   (2) under color of state law (3) deprived him of federal rights, privileges or immunities and

27   (4) caused him damage.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir.

28   2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278,

JDDL-K

- 17 -

1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).  As noted above, there is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability.  *Monell*, 436 U.S. 658.  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

If Plaintiff files an amended complaint, Plaintiff must write short, plain statements telling the Court: (1) the constitutional right Plaintiff believes was violated; (2) the name of the Defendant who violated the right; (3) exactly what that Defendant did or failed to do; (4) how the action or inaction of that Defendant is connected to the violation of Plaintiff's constitutional right; and (5) what specific injury Plaintiff suffered because of that Defendant's conduct.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

Plaintiff must repeat this process for each person he names as a Defendant.  If Plaintiff fails to affirmatively link the conduct of each named Defendant with the specific injury suffered by Plaintiff, the allegations against that Defendant will be dismissed for failure to state a claim.  **Conclusory allegations that a Defendant or group of Defendants has violated a constitutional right are not acceptable and will be dismissed**.

**VI.    Pending Motions**

On January 4, 2021, Plaintiff filed a Motion for Court Order asking the Court to order ADC staff to provide him with access to various legal materials.  On January 29, 2021, Plaintiff filed a Motion to Withdraw asking to withdraw his Motion for Court Order because he was provided access to LexisNexis.  Accordingly, the Court will grant the Motion to Withdraw and deny as moot the Motion for Court Order.

/ / /

JDDL-K

- 18 -

**VII.    Warnings**

    **A.    Release**

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of his release, either (1) notify the Court that he intends to pay the unpaid balance of his filing fee within 120 days of his release or (2) file a <u>non</u>-prisoner application to proceed in forma pauperis.  Failure to comply may result in dismissal of this action.

    **B.    Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

    **C.    Possible "Strike"**

Because the Complaint has been dismissed for failure to state a claim, if Plaintiff fails to file an amended complaint correcting the deficiencies identified in this Order, the dismissal may count as a "strike" under the "3-strikes" provision of 28 U.S.C. § 1915(g). Under the 3-strikes provision, a prisoner may not bring a civil action or appeal a civil judgment in forma pauperis under 28 U.S.C. § 1915 "if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  28 U.S.C. § 1915(g).

    **D.    Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  *See Ferdik*, 963 F.2d at 1260-61 (a district court may dismiss an action for failure to comply with any order of the Court).

/ / /

**IT IS ORDERED:**

(1)     Plaintiff's Application to Proceed In Forma Pauperis (Doc. 12) is **granted**.

(2)     As required by the accompanying Order to the appropriate government agency, Plaintiff must pay the $350.00 filing fee and is assessed an initial partial filing fee of $11.83.

(3)     Plaintiff's Motion to Withdraw (Doc. 14) is **granted**.

(4)     Plaintiff's Motion for Court Order (Doc. 9) is **denied** as moot.

(5)     The Complaint (Doc. 1) is **dismissed** for failure to state a claim.  Plaintiff has **30 days** from the date this Order is filed to file a first amended complaint in compliance with this Order.

(6)     If Plaintiff fails to file an amended complaint within 30 days, the Clerk of Court must, without further notice, enter a judgment of dismissal of this action with prejudice that states that the dismissal may count as a "strike" under 28 U.S.C. § 1915(g) and deny any pending unrelated motions as moot.

(7)     The Clerk of Court must mail Plaintiff a court-approved form for filing a civil rights complaint by a prisoner.

Dated this 11th day of February, 2021.

David G. Campbell
Senior United States District Judge